**UNITED STATES of America**

v.

**William Joseph SHEEHAN.**

**Crim. No. 75–394–F.**

United States District Court,
D. Massachusetts.

Nov. 1, 1977.

**1004**

Asst. U. S. Atty., Robert B. Collings, Boston, Mass., for U. S.

Martin G. Weinberg, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

FREEDMAN, District Judge.

This matter is before the court for consideration of William J. Sheehan's motion for a new trial. On November 25, 1975, a jury found Sheehan guilty of bank robbery and assault in violation of 18 U.S.C. § 2113(a) and (d). The court subsequently dismissed the count involving 18 U.S.C. § 2113(a). He was sentenced by this court on December 10, 1975 to a term of imprisonment of twelve years. His conviction was affirmed by the Court of Appeals for the First Circuit on July 13, 1976 (No. 75–1484). The

basis of the present motion centers around the failure of the government to provide the defendant Sheehan with certain information regarding a William A. Coale. Coale was apparently the only eyewitness to the bank robbery who had seen the unmasked faces of the robbers.

### The Trial Evidence

Sheehan was indicted for the robbery of the First National Bank of Yarmouth, Massachusetts on Route 28, which occurred on August 19, 1975. Evidence presented at the trial indicated that shortly before the robbery a tan van, owned by the "Bits and Baggage" store and stolen earlier that day, had pulled up in front of the bank. Three occupants of the van alighted from the vehicle, and wearing ski masks on their faces, entered the bank and robbed it. Trial Transcript, Vol. 2, pp. 7, 43, 56, 58–61, and 129–131. None of the witnesses called at the trial saw the unmasked faces of the three robbers who entered the bank.

The government theorized that Sheehan was the short, stocky man with a shotgun who remained in the lobby area of the bank. Various government witnesses estimated this man's height at 5'6" to 5'9". Tr. Vol. 2, pp. 8, 25–26. A bank teller who testified for the defense estimated this robber's height at about 5'9", under 6'. Tr. Vol. 3, p. 3–11. However, other witnesses in the bank described the shortest robber only as short and stocky. Sheehan is 5'4". Tr. Vol. 3, pp. 3–35 and 3–36. The government also presented bank surveillance photographs taken during the robbery which tended to show that the man with the shotgun had a short right thumb, as does Sheehan. Other surveillance photographs did not reveal this characteristic.[1]

Other evidence which was actually presented against Sheehan at trial may be summarized as follows. A government witness testified that soon after the robbery he followed the getaway van for a short while and saw it turn into a dirt road. Tr. Vol. 2,

---

**1.** The First Circuit opinion, in affirming Sheehan's conviction, chose not to rely on this ambiguous evidence in assessing the sufficiency of the evidence against Sheehan. *United States v. Sheehan,* 542 F.2d 1163 (1st Cir., 1976).

pp. 70–71. He reported this information to a police officer, Tr. Vol. 2, p. 71, who found the van abandoned on the dirt road and observed automobile tracks leading from the van. Tr. Vol. 2, pp. 74–75. Another witness, an employee of a zoo located near the dirt road, testified that at approximately 3:00 p. m., on August 19, 1975, she observed a yellow or tan Pontiac or Oldsmobile traveling down the road. Tr. Vol. 2, pp. 77–78. Another witness, who was waiting for his family in a car in a parking lot near the zoo, testified that he saw two or three persons get out of a tan[2] car in the parking lot[3] and approach another vehicle directly in front of the tan car. Tr. Vol. 2, pp. 83–86. One of these individuals placed something in the trunk of the second vehicle, although the witness did not see the object actually removed from the first car. Tr. Vol. 2, p. 86. The witness stated that he heard the individual in the tan car say, "I have got to get out of here," and then the tan car took off rather quickly toward the main entrance to the parking lot. Tr. Vol. 2, p. 87. The witness could not tell which direction the tan car went on Route 28 upon leaving the parking lot, but was able to observe that the vehicle had a Massachusetts registration with the last three digits 912. Tr. Vol. 2, pp. 87–88. The two or three other individuals got into the second car[4] and followed the first vehicle. Tr. Vol. 2, p. 88. This information was transmitted to the police who subsequently stopped a yellow vehicle with a license number having the last three digits 912. Tr. Vol. 2, pp. 97–102. The witness also observed the vehicle while it was stopped on Route 28 by the police and noted that it "looked like the one I had seen in the parking lot . . . ." Tr. Vol. 2, p. 90. The stopped yellow car belonged to, and was driven by, the defendant Sheehan. Tr. Vol. 2, p. 104. No weapons were found on Mr.

Sheehan or in the car. Tr. Vol. 2, pp. 103, 108–109. Nor was other evidence of the robbery found in the car. Tr. Vol. 2, pp. 108–109.

The following day, a stolen car was found abandoned at a beach parking lot and impounded by the authorities. Tr. Vol. 2, pp. 140–141, 146–147, and 162. This car contained a sales slip from "Bits and Baggage", Tr. Vol. 2, p. 145, which was identified by the store's owner as having been in the van sometime prior to its theft. Tr. Vol. 2, pp. 135–136. A parking receipt from a restaurant lot was discovered in the radiator shroud of this car. Two attendants from that lot identified Sheehan as being one of the two individuals who had been in this stolen car on August 13, 1975, six days before the bank robbery. Tr. Vol. 2, pp. 165–170, 180–181.

## Undisclosed Information Provided to the Government by William Coale

William Coale, who was never called as a witness at trial, saw the unmasked faces of the three robbers who entered the bank, as well as that of the driver who remained in the van. According to the information Coale provided to the Federal Bureau of Investigation ("FBI"), he was parked in an automobile directly in front of the bank on August 19, 1975, waiting for his father-in-law, Gustav R. Woernle, who had just gone inside the bank. While there, the tan van pulled up and parked to the right of Coale's car.[5] Coale was apparently the only one to observe the robbers alight from the van and then put on their masks. The driver remained in the vehicle and pointed a handgun at Coale while the other robbers were in the bank. Shortly after taking out the gun, the driver pulled a light colored handkerchief over his face.

---

2. At various points in the questioning at trial, this vehicle was apparently also referred to as being yellow or yellowish. Tr. Vol. 2, pp. 86–88.

3. He did not see this car enter the parking lot.

4. The witness testified that there may have been two vehicles besides the tan vehicle. Tr. Vol. 2, p. 89.

5. Coale told the FBI that the front of the van was facing his automobile and added that the front of the van was very close to the side door of his vehicle.

The information obtained from Coale was not directly given to Sheehan at any time prior to sentencing.[6] Rather, it was only discovered subsequently by Sheehan's counsel during the course of discovery concerning another defendant allegedly involved in the same robbery.

Coale was initially interviewed by the FBI on October 28, 1975, although the government asserts it only received the information regarding this interview no more than ten days before the trial. Collings Affidavit ¶ 8. During the interview, Coale related the information noted, *supra* at p. 5, and gave a description of the three robbers who entered the bank and the driver who remained in the van. He was shown an array of photographs from which he identified one picture as "look[ing] like the guy in the truck, the driver."[7] Sheehan's picture was not included in this display, although he had already been indicted. The government maintains that since it has never contended that Sheehan was the driver of the van, it was not necessary to include his picture in the photographic display shown to Coale. However, this court notes that before any pictures were shown to Coale, he had given the FBI a description of all *four* robbers. The court thus finds it rather curious that Sheehan's picture was not included within this photographic display.

On November 28, 1975, three days after Sheehan's conviction, but before he was sentenced, the government again displayed a group of photographs to Coale. Sheehan's photograph was included in this

group. According to the FBI report, Coale selected Sheehan's picture and stated that "[t]his individual appears to be similar to a face I've seen, but someone I do not know." However, the FBI report states that Coale was unable to indicate that Sheehan was similar or identical to any of the individuals he had seen entering the First National Bank of Yarmouth on August 19, 1975.[8] The information from this interview was not received by the United States Attorney until February 12, 1976. Collings Affidavit ¶ 9.

Subsequently, on June 10, 1976, Coale was again shown a spread of photographs which included Sheehan's picture. According to the FBI record of this interview, Coale advised the FBI that "the photograph of Sheehan was similar in appearance to one of the individuals who exited a van in front of the bank and entered the bank while putting on a mask." However, Coale also stated that "he could not be positive in this identification" but that "Sheehan was similar in appearance to one of these individuals." Coale then selected two additional photographs which also appeared familiar to him.[9]

## Conclusions of Law

■ The court rejects at the outset any argument advanced by the government that its failure to turn over to Sheehan evidence obtained from or concerning Coale was justified since that evidence was not received by the United States Attorney's office until

---

**6.** The government, however, contends that such information could have been easily discovered by Sheehan since Coale's name, address, phone number, and the fact that he was parked in front of the bank during the robbery, were contained within the statement of Gustav R. Woernle, which had been furnished to Sheehan. The merits of this assertion will be discussed *infra* at 13.

**7.** The man whom Coale selected as looking like the driver subsequently appeared before the grand jury, but was not indicted.

**8.** Coale also selected a photograph in addition to that of Sheehan. He stated, according to the FBI report, that that individual strongly resembled one of the three robbers who had entered the bank. However, Coale could not specifical-

ly identify this photograph as definitely being identical to one of these robbers and noted that while the face appeared to be very similar to one of the robbers, the hairstyle appeared to be somewhat different.

**9.** The FBI report on this interview notes that while Coale stated he was unable to make a positive identification from these photographs, he was "confident that in the event he should personally see any of the individuals involved in the bank robbery, he would be able to make an identification." At least with regard to the defendant Sheehan, the government has not shown that Coale was ever given any such opportunity.

either shortly before trial or after conviction. The government's constitutional obligation to disclose exculpatory evidence to the defendant is a continuing one. *United States v. Seijo,* 514 F.2d 1357 (2d Cir. 1975).[10] In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court, in holding that prosecutors are immune from suit under 42 U.S.C. § 1983, commented upon the prosecutor's

> duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation. At trial this duty is enforced by the requirements of due process, but after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.

*Id.* at 427, n. 25, 96 S.Ct. at 993. Moreover, government suppression of exculpatory evidence may justify a new trial irrespective of the good or bad faith of the prosecution. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The question which thus remains in the present case is whether the information concerning Coale was the type which the government had a duty to disclose to Sheehan, regardless of when that information became available to the prosecutor. This requires an analysis of the nature of the undisclosed evidence itself, as well as the nature of the request[s], if any, made by Sheehan to the government seeking information concerning eyewitnesses to the bank robbery on August 19, 1975. In *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the United States Supreme Court delineated three different standards for determining whether the prosecution's nondisclosure of information to a criminal defendant violates due proc-

ess. The first standard is applicable where the prosecution's case includes perjured testimony and the prosecution knew, or should have known, of the perjury. In that situation, the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397.

The second standard is applicable where there is a pretrial request for specific evidence and the information is not disclosed. Due process is violated under this standard if the requested but undisclosed evidence is shown to be material in the sense that its disclosure "might have affected the outcome of the trial." 427 U.S. at 104, 96 S.Ct. at 2398. This does not mean there is any "duty to provide defense counsel with unlimited discovery of everything known by the prosecutor . . .." 427 U.S. at 106, 96 S.Ct. at 2399. However, resolution of doubt on the part of the prosecutor seems to be in favor of disclosure to the defense or at least presentation to the court for in camera inspection. Thus, the Supreme Court concluded that

> if the subject matter of such a request is material, *or indeed if a substantial basis for claiming materiality exists,* it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge. When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.

427 U.S. at 106, 96 S.Ct. at 2399 (emphasis added).

The third standard set forth in *Agurs* is applicable where the defense counsel has only made a general request for all exculpatory or *Brady*[11] material, or has made no

---

10. The prosecution itself recognized the continuing nature of its obligation to provide exculpatory evidence to the defense. Assistant United States Attorney Collings' letter to defense counsel, ¶ 5, dated September 8, 1975.

11. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> In that case, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196. *See also,*

request at all. Under this standard, constitutional error is committed if, in the context of the entire record, "the omitted evidence creates a reasonable doubt [as to the defendant's guilt] that did not otherwise exist. . . ." 427 U.S. at 112, 96 S.Ct. at 2401. A new trial is then warranted.

The first standard articulated in *Agurs* is clearly inapplicable to the present case. However, whether the second or third standard is applicable requires closer scrutiny. Sheehan's counsel made a pretrial Motion for Means of Identification in which the first paragraph requests "[t]he names and addresses of each witness who either tentatively or positively identified the defendant William Joseph Sheehan in West Yarmouth, Massachusetts and anytime on August 19, 1975." Paragraphs three through six of that motion request the government to reveal the specific method of identification, the law enforcement officer who conducted the identification procedure or interview from which the identification was elicited, the date and location of each such identification procedure or interview, and the name and address of each other individual whose photograph was involved in any identification procedure. Sheehan's counsel also made a Motion for Exculpatory Evidence which requested "[a] list of all witnesses who were shown a photographic spread which contained the photograph of the defendant Sheehan and who, upon being shown the photographic spread, did not positively identify" Sheehan as one of the bank robbers. The motion also requested "any and all statements" made by these witnesses.

Neither of these motions specifically request the government to provide the defense with an eyewitness to the robbery who was not asked to identify Sheehan. And Coale was not directly asked to identify Sheehan's photograph until the second interview with the FBI. However, the purpose of the specific request requirement is to put the prosecution on notice as to the evidence the defense considers material. *United States v. Keough,* 391 F.2d 138, 147 (2d Cir. 1968); *Jones v. Jago,* 428 F.Supp. 405, 408 (N.D.Ohio 1977). When Sheehan's motions are viewed together, this function is served. The prosecution was alerted to the defense's need for the identification of any eyewitnesses and their statements.

An eyewitness is of great importance in any case. This is particularly so when, as here, the undisclosed eyewitness is the *only* one who saw the unmasked faces of the robbers, and the case against the defendant is "not without gaps," as the Court of Appeals observed, *supra* at 10, in affirming Sheehan's conviction. Nevertheless, the government argues that Coale's statements were not exculpatory with regard to Sheehan. I disagree. The government points to the fact that on October 28, 1975, Coale was not even shown a photograph of Sheehan and the picture he actually selected was alleged to be the driver of the getaway van. The government has never contended that Sheehan was the driver. Yet, as already noted, *supra* at 6, Coale gave descriptions of all four robbers. This interview aside, however, at least some of the statements which Coale made in his second interview on November 28, 1975 were certainly exculpatory with regard to Sheehan. While Coale selected Sheehan's photograph, he was not able to identify him as one of the bank robbers. See pp. 6–7, *supra.* Coale's third interview concluded with rather different results than the second. However, in view of Coale's unique evidentiary role in this case,[12] I conclude that his statements, taken all together, "might have affected the outcome of the trial." *United States ex rel. Meers v. Wilkins,* 326 F.2d 135 (2d Cir. 1964); *United States v. Hibler,* 463 F.2d 455, 460 (9th Cir. 1972); *United States v. McCrane,* 547 F.2d 204 (3d Cir. 1976). *Cf. United States v. Donatelli,* 484 F.2d 505, 508 (1st Cir. 1973); *United States v. Tucker,* 552 F.2d 202 (7th Cir. 1977); *United States v. Pollock,* 402 F.Supp. 1310 (D.Mass. 1975).

*Giles v. Maryland,* 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed. 737 (1967).

12. Sheehan's trial counsel has stated that "given the totally circumstantial nature of the case,

he would have been inclined to call such a person [as Coale] as a witness if he were aware of the existence of such an eye witness." Arena Affidavit ¶ 9.

Since the information was therefore "constitutionally material," it should have been disclosed to Sheehan. Failure to do so deprived Sheehan of due process and a new trial is warranted.

In its opposition to the motion for a new trial, the government points out that Sheehan was given the statement of Gustav R. Woernle and that within that statement was Coale's name, address, telephone number, and the fact that he was outside the bank at the time of the robbery. Consequently, it argues that Sheehan had been furnished the necessary information concerning Coale, and upon careful investigation could have discovered any other pertinent evidence involving Coale. Sheehan disputes this assertion, claiming that in view of the multitude of statements by other witnesses to the robbery, the absence of any independent statement from Coale led the defense to conclude that Coale had no evidentiary importance. Thus, the defense attached no significance to Coale's identification within the Woernle statement. Because of the extremely important and unique role played by Coale, the court must agree with Sheehan on this point.[13]

Even if the requests made by Sheehan's trial counsel are not deemed to be sufficiently specific to come within the second standard set forth by the Supreme Court in *Agurs, supra,* a new trial is still warranted under the third standard articulated in that decision. Thus, viewed in the context of the entire record, the undisclosed evidence concerning Coale "creates a reasonable doubt" as to Sheehan's guilt "that did not otherwise exist." There is no question that the circumstantial case against Sheehan put together by the police and the FBI represents excellent investigatory efforts. Nevertheless, the chain of evidence so gathered has gaps. When these gaps are combined with the fact that the only eyewitness who saw the unmasked faces of the robbers, could not, on at least one occasion, identify Sheehan as one of the robbers, a possible reasonable doubt as to his guilt may have been created. While it is true that on June 10, 1976 Coale identified Sheehan as being similar in appearance to one of the robbers who entered the bank, he was unable to indicate on November 28, 1975 that Sheehan was one of the robbers entering the bank. The court notes that the November date was some six and one-half months closer to the time of the robbery than the June date. Additionally, Coale expressed a desire to view Sheehan in person in order to bolster his identification. This opportunity was never provided. *See* n. 9, *supra.* When all these facts are combined and the record viewed in its entirety, the court concludes that Sheehan's motion for a new trial should be granted.

As a result of this court's holding with regard to Sheehan's motion for a new trial on the basis of his being denied due process, it is unnecessary to reach his request for a new trial on the basis of newly discovered evidence.

For all the foregoing reasons, Sheehan's motion for a new trial is granted. It is so ordered.

---

**13.** Moreover, the court observes that there appears to have been some confusion between counsel for the prosecution and for Sheehan as to the type of information which was being disclosed to the defense. The government contends that prior to trial, as a result of a discussion with Sheehan's trial counsel, the government agreed to provide Sheehan's counsel with "statements of all witnesses in the bank, regardless of whether or not I [the government] was intending to call them as part of the Government's case." Collings Affidavit ¶ 5. On or before November 20, 1975, these statements, as well as Jencks Act (18 U.S.C. § 3500) material, was furnished to Sheehan's counsel. Collings Affidavit ¶ 6. Sheehan's trial attorney maintains that the Assistant United States Attorney in charge of the case represented to him that the discovery material included witness statements of both individuals whom the government intended to call as witnesses at trial and those it did not intend to call, and from this defense counsel "believed he was receiving the statements of any and all witnesses who observed the robbery. . . ." Arena Affidavit ¶ 7; Arena Supplemental Affidavit ¶ 2.