**UNITED STATES of America**

v.

**Allen W. STEWART**

**No. CRIM. A. 96–583.**
**No. CIV. A. 00–6299.**

United States District Court,
E.D. Pennsylvania.

June 7, 2001.

574

Linda Dale Hoffa, U.S. Attorney's Office, Philadelphia, PA, for plaintiff.

Allen W. Stewart, Fort Dix, NJ, pro se.

Joseph M. Fioravanti, Media, PA, Thomas D. Schneider, Philadelphia, PA, for defendant.

### MEMORANDUM

BARTLE, District Judge.

Before the court is the motion of Allen W. Stewart ("Stewart") under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence.

Stewart was convicted by a jury in December, 1997 of 135 counts of violating the Racketeer Influenced and Corrupt Organi-

zations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, as well as federal mail fraud, wire fraud, and money laundering statutes. 18 U.S.C. §§ 1341, 1343, 1957. The charges arose out of Stewart's involvement in a complex scheme to loot Summit National Life Insurance Company ("Summit") and Equitable Beneficial Life Insurance Company ("EBL"). The jury also determined that certain of Stewart's assets were subject to forfeiture under the RICO and money laundering laws. On August 13, 1998 Stewart was sentenced to 15 years imprisonment, and an order of restitution in the amount of $60.1 million was entered against him. His conviction and sentence were subsequently affirmed by the Court of Appeals, *United States v. Stewart*, 185 F.3d 112 (3d Cir.1999), and the Supreme Court thereafter denied certiorari. *Stewart v. United States*, 528 U.S. 1063, 120 S.Ct. 618, 145 L.Ed.2d 512 (1999).

### I.

Stewart's timely collateral attack first challenges his convictions for mail fraud under 18 U.S.C. § 1341 [1] and wire fraud under 18 U.S.C. § 1343.[2] To support his argument that these convictions must be vacated, Stewart relies on *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), decided after the Supreme Court denied certiorari in this case, and thus after his conviction became final. *Cleveland* held that licenses issued by states are not property within the

---

1. Title 18 U.S.C. § 1341 provides in relevant part:

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ..., or takes or receives therefrom, any such matter or thing, ..., shall be fined

under this title or imprisoned not more than five years, or both.

2. The wire fraud statute is identical to the mail fraud statute except that the wrongdoer "transmits or causes to be transmitted by means of wire, ... any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.

meaning of the federal mail fraud statute.[3] Since the mail fraud statute "requires the object of the fraud to be 'property' in the victim's hands," the Court concluded that the use of fraud to obtain a state license does not fall within the ambit of § 1341. *Id.* at 374. Thus, even though "licensees may have property interests in their licenses," using a scheme or artifice to defraud in order to obtain a license from a state regulator does not constitute a violation of § 1341. *Id.*

Before turning to the merits of Stewart's *Cleveland* argument, we must decide whether his claim is procedurally defaulted.[4] While Stewart raised the issue of licenses not constituting property under the mail and wire fraud statutes prior to trial and in his certiorari petition, he did not assert it during his direct appeal. The Supreme Court most recently addressed procedural default in *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). *See also United States v. Frady*, 456 U.S. 152, 167, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). *Bousley* made clear that the procedural default rule applies to claims arising under decisions like *Cleveland* which hold "that a substantive federal criminal statute does not reach certain conduct." *Id.* at 620, 118 S.Ct. 1604. If such a claim has been procedurally defaulted because it was not

raised on direct review, "the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Id.* at 622, 118 S.Ct. 1604 (citations omitted).

■ "Cause" for failing to raise a claim exists if the claim had "no reasonable basis in existing law." *Reed v. Ross*, 468 U.S. 1, 15, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). In other words, a defendant may demonstrate "cause" for his procedural default if an issue was "so novel that its legal basis [was] not reasonably available to counsel." *Id.* Stewart's *Cleveland* claim is not "so novel" as to constitute cause. *See Bousley*, 523 U.S. at 622, 118 S.Ct. 1604. At the time of Stewart's trial and appeal the question whether licenses were property under § 1341 was a hotly contested issue subject to great debate in the lower courts. Many circuits had already reached the conclusion licenses were not property for purposes of the mail fraud statute. *See United States v. Shotts*, 145 F.3d 1289, 1296 (11th Cir.1998); *United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir.1991); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir.1990); *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir.1989); *United States v. Dadanian*, 856 F.2d 1391, 1392 (9th Cir.1988); *United States v. Murphy*, 836 F.2d 248, 254 (6th Cir.1988).

**3.** While *Cleveland* dealt only with the federal mail fraud statute, it is also applicable to the federal wire fraud statute. *See United States v. Tarnopol*, 561 F.2d 466, 475 (3d Cir.1977).

**4.** We note that Stewart attempts to couch his *Cleveland* argument as a nonwaivable jurisdictional defect of which there can be no procedural default. We disagree with this characterization. In *Cleveland* the Court interpreted the term "property" in a different, more restrictive manner than some lower courts had. In that sense it is analogous to cases such as *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), where the term "using" a firearm in 18

U.S.C. § 924(c)(1) was redefined, and *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), where the reach of the mail fraud statute was restricted to exclude an intangible rights theory. Courts addressing the application of *Bailey* and *McNally* in post-conviction proceedings have not excused procedural default unless the test for doing so has been met. *See, e.g., Bousley v. United States*, 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *United States v. Osser*, 864 F.2d 1056 (3d Cir.1988); *United States v. Shelton*, 848 F.2d 1485 (10th Cir. 1988).

Several circuits, including our Court of Appeals, had made the opposite determination. *See United States v. Salvatore,* 110 F.3d 1131, 1138 (5th Cir.1997); *United States v. Bucuvalas,* 970 F.2d 937, 945 (1st Cir.1992); *United States v. Martinez,* 905 F.2d 709, 715 (3d Cir.1990). Clearly then, the basis of the claim was not novel at the time of Stewart's direct appeal.

Stewart notes that it was because of the binding authority of the Third Circuit's decision in *Martinez* that he did not raise the license issue on direct appeal. In other words, he contends it would have been futile for him to do so. The Supreme Court has explicitly stated that this position is unavailing because "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." *Bousley,* 523 U.S. at 623, 118 S.Ct. 1604 (quoting *Engle v. Isaac,* 456 U.S. 107, 130 n. 35, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982)). Since "a § 2255 movant cannot show 'cause' for failing to make ... [an] argument on direct appeal by demonstrating that circuit law at the time would have made any such argument futile," Stewart has no "cause" for his default. *United States v. Ramos,* 147 F.3d 281, 287 (3d Cir.1998).

■ Stewart also argues that his counsel was ineffective for failing to raise the *Cleveland* issue on appeal. "It is now well-established that a successful claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, ... satisfies the 'cause' prong of a procedural default inquiry." *United States v. Garth,* 188 F.3d 99, 107 (3d Cir.1999). In order to establish a claim of ineffective assistance of counsel under *Strickland* that rises to the level of constitutional error, a petitioner must prove: (1) counsel's performance "fell below an objective standard of reasonableness," that is, that he "made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) the deficient representation prejudiced petitioner, that is, that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687–88, 104 S.Ct. 2052.

It is well settled that when choosing which issues to raise on appeal, "[a]n exercise of professional judgment is required. Appealing losing issues 'runs the risk of burying good arguments ... in a verbal mound made up of strong and weak contentions.'" *Sistrunk v. Vaughn,* 96 F.3d 666, 670 (3d Cir.1996) (quoting *Jones v. Barnes,* 463 U.S. 745, 753, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). Only in rare cases will failure to raise an issue on appeal constitute ineffective assistance of counsel because the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (internal quotations omitted).

■ Stewart's trial lasted approximately six weeks. Numerous pre-trial, trial, and post-trial motions were made and ruled on by this court. There existed a plethora of issues that could have been appealed. Stewart's counsel chose to pursue 10 issues on appeal in a lengthy 85 page brief. Viewed in light of Third Circuit law at the time, the license issue was weak and unlikely to prevail. *See Martinez,* 905 F.2d at 715. Thus, the decision not to pursue it clearly "fell within the 'wide range of professionally competent assistance' required under the Sixth Amendment to the Federal Constitution." *Smith,* 477 U.S. at 536, 106 S.Ct. 2661 (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

■ Furthermore, "there is no general duty on the part of defense counsel to anticipate changes in the law," *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir.1989), and failure to do so does not constitute ineffective assistance of counsel. *See Sistrunk*, 96 F.3d at 672; *Horne v. Trickey*, 895 F.2d 497, 500 (8th Cir.1990). Keeping in mind that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," we find that the failure of Stewart's counsel to anticipate the Supreme Court's ruling in *Cleveland* does not amount to ineffective assistance of counsel and that Stewart has therefore failed to show "cause" for the procedural default. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052.

■ The only way which Stewart's lack of "cause" for his procedural default can be excused is if he can establish "actual innocence." *Bousley*, 523 U.S. at 623, 118 S.Ct. 1604. To establish "actual innocence" a defendant must show that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* "Simply stated, 'actual innocence' ... means that the person did not commit the crime." *Garth*, 188 F.3d at 107 (internal quotations omitted). If a defendant can demonstrate "actual innocence," then the court can consider the merits of the defaulted claim. *Id.* at 107–08.

Stewart simply cannot take advantage of this exception, reserved for a "fundamental miscarriage of justice." *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). There was overwhelming evidence presented at trial that Stewart devised schemes to defraud people of money and property other than licenses, including premiums from policyholders and customers, dividends, and various types of fees. Furthermore, the jury clearly found that property other than licenses was obtained through his schemes because it returned special verdicts requiring Stewart to forfeit specific amounts of money and pieces of property under the RICO and money laundering forfeiture laws. Given the above, Stewart clearly cannot meet the *Bousley* standard, which requires him to show that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." 523 U.S. at 623, 118 S.Ct. 1604. He has not established that he is "actually innocent" of his mail and wire fraud convictions and has thus procedurally defaulted his *Cleveland* claim.

## II.

Even if we are incorrect that Stewart has procedurally defaulted his *Cleveland* claim, he cannot succeed on the merits. Stewart argues that he is entitled to relief under *Cleveland* because the superseding indictment under which he was charged defined property under the mail and wire fraud counts to include licenses among other items. As a result, Stewart maintains his conviction was flawed since licenses are not property under the mail and wire fraud statutes.

Stewart was charged in a lengthy and detailed 157 count superseding indictment.[5] Count 1 alleged a RICO violation and charged that Stewart had committed four racketeering acts, or schemes. As recorded on the verdict sheet, the jury found that Stewart committed all four schemes alleged, as well as all of their predicate acts. Racketeering Act No. 1

---

5. Counts 3, 5–13, 15, 20, 21, 23, 34, 35, 74, 75, 119 and 120 were removed from the case prior to its submission to the jury.

alleged a scheme to conceal the insolvency of Summit in order to permit Stewart to continue to control and operate it. Act No. 1 cited 17 predicate acts of mail fraud which Stewart allegedly committed.[6] Racketeering Act No. 2, which incorporated mail fraud counts 2 through 19 as its predicate racketeering acts, charged a scheme to loot Summit and EBL of their valuable assets. Act No. 3, which incorporated wire fraud counts 24 through 32, alleged a scheme to deceive regulators regarding reinsurance. Finally, Act No. 4 charged that the defendant devised and executed a scheme to inflate Summit's financial statements with an overvalued promissory note. It relied upon mail fraud counts 33 through 120 as its predicate racketeering acts.[7]

The superseding indictment charged that through the operation of the above schemes Stewart obtained money and property, including licenses and the retention of licenses, premiums from policyholders and customers, dividends, consulting and management fees, and an inflated sales price for Summit. *See* Superseding Indictment at 17, ¶ 52; 31, ¶ 34; 42, ¶ 25; 47, ¶ 13.[8] After *Cleveland,* it is now clear that fraudulently obtaining licenses from state regulators does not amount to a violation of § 1341 and § 1343. Stewart argues that even a mere possibility that the jury convicted him under the legally deficient theory that state insurance licenses constitute property under the mail and wire fraud statutes mandates that his convictions be vacated under the authority of *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), *overruled on other grounds, Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

In *Yates* a jury convicted the defendants of conspiring to violate the Smith Act which prohibited (1) advocating the duty and necessity of overthrowing the United

---

6. During the trial and before submission of the case to the jury we struck predicate acts 1C–1E, 1G–1O and 1W. *United States v. Stewart,* Crim. A. No. 96–583, 1998 WL 372426 (E.D.Pa. June 2, 1998); N.T., Dec. 16, 1997, at 27.

7. Counts 121 through 155 of the superseding indictment alleged violations of the federal money laundering statute during the operation of the looting scheme described in counts 2 through 23. The superseding indictment also included a RICO forfeiture count and a money laundering forfeiture count.

8. The relevant paragraphs of the superseding indictment are reproduced below.

RICO Count 1 ¶ 52: "It was part of the scheme that by all the foregoing the defendant Allen W. Stewart and other entities he controlled would and did obtain money and property, including Summit, the funds to purchase Summit, licenses and the retention of licenses, premiums from policyholders and customers, dividends, consulting fees, management fees, money from investors, legal fees and other fees."

Mail Fraud Counts 2–19 ¶ 34: "It was part of the overall scheme described above that, in addition to the money and property described above, the defendant Allen W. Stewart, and others would obtain, directly and indirectly, other money and property, including licenses and the retention of licenses, premiums from policyholders and customers, dividends, consulting fees, management fees, legal fees, and an inflated sales price for the companies." Wire Fraud Counts 24–32 ¶ 25: "It was part of the scheme that by all the foregoing the defendant Allen W. Stewart and other entities would obtain money and property, including licenses and the retention of licenses, premiums from policyholders and customers, dividends, consulting fees, management fees, and an inflated sales price for Summit National Life Insurance Company."
Mail Fraud Counts 33–124 ¶ 13: "It was part of the scheme that by the foregoing, the defendant Allen W. Stewart and other entities would obtain money and property, licenses and the retention of licenses, premiums from policyholders and customers, dividends, consulting fees, management fees, and attorney fees and an inflated sale price for Summit."

States Government and (2) organizing a group as the Communist Party. *Id.* at 300, 77 S.Ct. 1064. On appeal the defendants argued that the court improperly instructed the jury on the meaning of the term "organize," which resulted in their conviction of a crime barred by the statute of limitations. Since the Communist Party came into being in 1945, but the indictment was not forthcoming until 1951, the three-year statute of limitations had expired on the "organizing" charge, and defendants therefore could not be found guilty of it. *Id.* at 312, 77 S.Ct. 1064. The Government contended that even if the "organizing" charge was infirm, the conviction should stand because the jury also found defendants guilty of the "advocacy" charge. The Supreme Court disagreed, explaining that it had "no way of knowing whether the overt act found by the jury was one which it believed to be in furtherance of the 'advocacy' rather than the 'organizing' objective of the alleged conspiracy." *Id.* at 311–12, 77 S.Ct. 1064. The Court held that "[i]n these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Id.* at 312, 77 S.Ct. 1064.

*Yates* was an extension of *Stromberg v. California*, 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), where the Supreme Court held that if any of the grounds upon which a general verdict rests "is invalid under the Federal Constitution, the conviction cannot be upheld." It marked the first time that the Supreme Court applied *Stromberg* "to a general verdict in which one of the possible bases of conviction did not violate any provision of the Constitution but was simply legally inadequate (because of a statutory time bar)." *Griffin v. United States*, 502 U.S. 46, 55, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). A further extension of *Stromberg* was sought in *Griffin*. There, the defendant argued that under *Yates* her conviction for a multiple-object conspiracy should be set aside because the evidence was inadequate to support conviction as to one of the objects. The Supreme Court rejected the argument. It held that a general verdict is valid as long as one of the possible bases of conviction is supported by sufficient evidence. *Griffin*, 502 U.S. at 56–57, 112 S.Ct. 466. The Court's holding rested upon an important distinction from *Yates*:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence.

*Id.* at 59, 112 S.Ct. 466. In other words, "[c]ourts assume that juries can distinguish good proof from bad, but juries do not separate good *law* from bad. That's the line between *Yates* and *Griffin*." *Tenner v. Gilmore*, 184 F.3d 608, 611 (7th Cir.1999).

Stewart argues that his situation falls on the *Yates* side of the line because the jury was instructed that it could convict him of mail and wire fraud if they found he had fraudulently schemed to obtain state insurance licenses, a legally insufficient theory after *Cleveland*. The charge to the jury did not specifically mention licenses. It did, however, refer the jury to the su-

perseding indictment on various occasions for a description of the schemes alleged. The jury was instructed that in order to convict Stewart of mail and wire fraud it had to find that he "knowingly devised or intended to devise a scheme or artifice to defraud or to obtain money or property by false or fraudulent pretenses, representations or promises as detailed in the superseding indictment." As mentioned above, the superseding indictment defined money and property to include licenses and the retention of licenses, as well as premiums from policyholders and customers, dividends, consulting and management fees, and an inflated sales price for Summit.

We agree with Stewart that as a result of the later decided *Cleveland* case the jury charge, through the incorporation of the superseding indictment, contained a legally deficient theory of criminal liability. We disagree, however, with Stewart's contention that his convictions must therefore be set aside. To begin with, Stewart's convictions on counts 2 through 19 and 20 through 23 are valid because his money laundering convictions operate as a special verdict as to these counts.[9] "Special verdicts avoid the *Yates* problem, because the court then can be confident that the facts as the jury believed them to be are a legally proper basis of conviction." *Tenner*, 184 F.3d at 612.

To convict Stewart of money laundering as charged in counts 121 through 155 the jury was required to find that the money identified in the counts was "derived from specified unlawful activity, that is mail fraud, in violation of Title 18, United States Code, Section 1341, as charged in Counts 2 through 19 of this indictment, and wire fraud, as charged in Counts 20 through 23 of this indictment." Superseding Indictment at 60, 62, 64–68. Thus, Stewart's conviction on counts 121 through 155 makes it clear that the jury found that money, not licenses, was an object of the scheme alleged in counts 2 through 19 and 20 through 23. Since money is a proper object of a scheme to defraud under the mail and wire fraud statutes, we are "absolutely certain that the jury relied upon the legally correct theory to convict the defendant," and we will not set aside his conviction on counts 2 through 19 and 20 through 23. *Keating v. Hood*, 191 F.3d 1053, 1062 (9th Cir.1999) (internal quotation omitted). As these counts were the predicate acts for Racketeering Act No. 2, it also stands.

As for counts 24 through 120 and the other three racketeering acts, the charge insofar as it referred to licenses was legally wrong.[10] However, the evidence was also insufficient to convict on the basis of fraudulently obtained licenses. At trial there was virtually no evidence regarding the obtaining or retaining of licenses. What little there was all referred to time periods before the time alleged in the superseding indictment. In such a case, we conclude that *Griffin*, not *Yates*, must control because "there is no possibility that the jury convicted the defendant[ ] on the improper charge." *United States v. Wilson*, 116 F.3d 1066, 1080 (5th Cir.1997); *see United States v. Hanafy*, 124 F.Supp.2d 1016, 1030 n. 20 (N.D.Tex.2000). Such a result is also necessary if we are to

---

**9.** Stewart was actually only convicted on counts 2, 4, 14, 16–19, and 22, as the other counts were stricken prior to trial. For simplification, however, we will refer to the overall group of counts that make up a scheme. We will also do this for counts 33 through 120, even though some of the individual counts in that group were also stricken.

**10.** As noted, under the prevailing authority of *Martinez*, the charge was legally correct when given. *Martinez* was subsequently abrogated by *Cleveland*.

"[r]ecall the point of *Griffin:* a jury may be relied on to get the facts right and avoid logical errors." *Tenner,* 184 F.3d at 612.

In support of his position, Stewart points to the fact that the superseding indictment describes how he caused Parkway Life Insurance Company and Cathedral Life Insurance Company to be formed. Superseding Indictment at 37, ¶ 2; 25, ¶ 7. Since these insurance companies had to obtain new state regulatory licenses, Stewart argues that this is evidence the jury could have used to convict him of a scheme to obtain licenses. He ignores the fact that these formations occurred in 1989, at least three years before any crime or scheme alleged in the superseding indictment. The jury was specifically charged that to convict Stewart on counts 24 through 120 they needed to find that the schemes alleged in those counts were devised in late 1992 and early 1993.[11] Stewart would thus have us presume that the jury ignored this legal instruction and also its duty as judges of the facts. Making this presumption would be contrary to the holding of *Griffin,* that "perverse fact-finding should not be attributed to juries." *Tenner,* 184 F.3d at 612. It would also contravene "the almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d

176 (1987); *see Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

The above conclusion is supported and compelled by *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally,* like *Cleveland,* involved a restriction of the scope of the federal mail fraud statute. In *McNally* a former Kentucky public official and a private individual were charged and convicted of violating the federal mail fraud statute based upon the theory that they "defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." *Id.* at 352, 107 S.Ct. 2875. The Supreme Court reversed their convictions on direct appeal, holding that § 1341 does not prohibit "schemes to defraud citizens of their intangible rights to honest and impartial government." *Id.* at 355, 107 S.Ct. 2875.

In restricting the reach of the mail fraud statute to exclude an intangible rights theory, *McNally* overturned a "line of decisions from the Courts of Appeals" holding the opposite. *Id.* Not surprisingly, the decision resulted in a deluge of petitions from defendants convicted under the pre-*McNally* interpretation of § 1341 who sought to have their convictions over-

---

11. The relevant portions of the charge read as follows:

Counts 24 through 32 charge a wire fraud scheme to deceive state insurance regulators involving reinsurance. The superseding indictment alleges that in late 1992 or early 1993 the defendant devised a scheme to deceive state regulators and others regarding the true and complete reinsurance arrangements involving Summit National Life Insurance Company, its subsidiary Fidelity General Life Insurance Company, and the Alabama Reassurance Company in order to inflate their financial statements.

Counts 33, 36 through 73, and 76 through 118 of the superseding indictment charge that from in or about December, 1992 to in or about July, 1993 the defendant devised and intended to devise a scheme to defraud and to obtain money and property by inflating Summit National Life Insurance Company's financial statements with overvalued promissory notes from its corporate parent, SNL Corp., in order to deceive regulators, the buyer, and others regarding the true financial condition of the company and that the United States mails were used in furtherance of this scheme.

turned. One such case was *United States v. Asher*, 854 F.2d 1483 (3d Cir.1988). In *Asher* the defendant was convicted on five counts of mail fraud due to his participation in a scheme to accept bribes in exchange for awarding a no-bid Social Security tax ("FICA") recovery contract to CTA Limited ("CTA"). On appeal Asher argued that *McNally*, which was issued after his conviction, mandated that his convictions be overturned.

The court examined the treatment other courts had given post-*McNally* cases and found that, "those cases that have *sustained* mail fraud convictions have done so where the 'bottom line' of the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state." *Id.* at 1494. It explained:

> Essentially, therefore, where rights are involved whose violation would lead to no concrete economic harm, and where those rights are the only rights involved in the case, *McNally*'s proscriptions would prevent upholding conviction on appeal. Where, on the other hand, a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact, then the presence of intangible rights language will not prove fatal on appeal.

*Id.* Applying the above precepts, the court upheld Asher's mail fraud convictions. It arrived at this result by first noting that both the indictment and the jury instructions in the case contained numerous references to "concrete economic or property losses." *Id.* at 1495. While the jury instructions also made references to intangible losses, this was not fatal because the court was "satisfied that the government . . . could not have proved a violation of

intangible rights without simultaneously proving that the Commonwealth of Pennsylvania was deprived of money as the result of the no-bid contract awarded to CTA." *Id.* at 1496. Since the jury "could not have found a fraudulent scheme that consisted solely of depriving the citizens of their right to honest government that did not also involve tangible losses," Asher's conviction was allowed to stand. *Id.*

The same result was reached in *United States v. Osser*, 864 F.2d 1056 (3d Cir. 1988), in a collateral attack filed after the defendant's conviction was final and after the Supreme Court decided *McNally*. Osser, a City Commissioner of Philadelphia, was found guilty of seven counts of mail fraud in 1973. The jurors in Osser's case were instructed that they could find a violation of § 1341 on several different theories. One theory involved a kickback scheme in which Osser participated. That theory was still valid after *McNally*. The other involved his deprivation of the citizens of Philadelphia of his honest and impartial services through a bid rigging scheme, an invalid theory after *McNally*.

Osser argued that his convictions must be vacated "because the issue of guilt was submitted to the jury on two theories, one of which was invalid," essentially the same argument Stewart is making under *Yates*. *Osser*, 864 F.2d at 1058. After analyzing *Asher*, the court disagreed, reasoning that once the jury "found that Osser had participated in the bid rigging, [it] could not escape finding financial loss as part of the scheme." *Id.* at 1063. Since Osser's actions unquestionably "resulted in a substantial monetary detriment to the City, and no rational juror could conclude otherwise," the court refused to vacate Osser's convictions and affirmed the district court's denial of his coram nobis petition.

*Id.*[12]

We see no practical distinction between *Asher* and *Osser* and Stewart's case. *Cleveland,* like *McNally,* restricted the scope of the federal mail fraud statute by holding that state issued licenses were not property for its purposes. Stewart, like Asher and Osser, was convicted by a jury that heard references to what turned out to be an invalid legal theory in the indictment and the charge. Like the courts in *Asher* and *Osser,* we conclude that the mere presence of the invalid license theory does not mandate that Stewart's conviction be vacated. We do so because there is no way the jury could have found that Stewart committed mail fraud by devising a scheme to obtain or retain licenses and not have found he devised a scheme to obtain other money and property as well. *See Asher,* 854 F.2d at 1496. Even if the jury were to have found a scheme to obtain licenses, the ultimate purpose of such a scheme necessarily would have been to enable Stewart to obtain money and property in the form of premiums from policyholders and customers, dividends, consulting and management fees, and the inflated sales price for Summit. Since "the 'bottom line' of the scheme or artifice had the inevitable result of effecting monetary or property losses," Stewart's mail and wire fraud convictions will not be vacated because of any reference in the charge to licenses. *Id.* at 1494.

### III.

Stewart also argues in his § 2255 motion that the superseding indictment was defective because it failed to allege explicitly that he made "material" misrepresenta-tions in furtherance of his schemes. This argument was not raised previously. Subsequent to Stewart's indictment and conviction the Supreme Court held in *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Because the word "material" does not appear in the superseding indictment's allegations of mail and wire fraud, Stewart argues that the superseding indictment is fatally deficient and his convictions must be vacated.

■■ An indictment must set forth all of the elements of an offense, and if it does not do so, it is fundamentally flawed. *United States v. Spinner,* 180 F.3d 514, 515–16 (3d Cir.1999). When a challenge to the indictment's sufficiency is raised for the first time after trial, as is the case here, we are to "construe the indictment liberally in favor of validity." *United States v. Cefaratti,* 221 F.3d 502, 507 (3d Cir.2000). Even assuming that Stewart's contention is not procedurally defaulted, we conclude that it is without merit.

An indictment satisfies the requirements of the Fifth and Sixth Amendments "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). Although it is vital for an indictment to include all elements of a charged offense, "the law does not compel a ritual of words" when determining if an indictment is sufficient.

---

**12.** Prior to reaching the merits of *Osser's* case, the court affirmed the district court's determination that Osser had procedurally defaulted his *McNally* claim under *Frady* because he did not raise it at trial or on appeal.

This supports our earlier conclusion that a claim such as the one Stewart is making under *Cleveland* can be procedurally defaulted.

*United States v. Wilson*, 884 F.2d 174, 179 (5th Cir.1989); *see United States v. deVegter*, 198 F.3d 1324, 1330 (11th Cir.1999). Our Court of Appeals has instructed:

> [A]n indictment may set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished. Furthermore, an indictment that charges a legal term of art sufficiently charges the component parts of the term.

*Cefaratti*, 221 F.3d at 507 (internal quotations and citations omitted).

In support of his position, Stewart heavily relies on *United States v. Spinner*. There the court on direct appeal found the indictment for access device fraud to be deficient because it failed to allege the interstate commerce element of the crime charged. *Spinner*, 180 F.3d at 515–16. The access device fraud statute, 18 U.S.C. § 1029(a)(5), specifically requires that the "offense affects interstate or foreign commerce."

We reject Stewart's reliance on *Spinner*. Unlike *Spinner*, the superseding indictment here did not omit any statutory element of the crimes charged. The mail and wire fraud statutes require "a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. §§ 1341, 1343. They nowhere use the word "material." Mirroring the statutes, the superseding indictment stated that Stewart "devised and intended to devise a scheme to defraud and to obtain money or property, directly or indirectly, by means of false and fraudulent pretenses and representations."

The word "fraud" is a "legal term of art." *Cefaratti*, 221 F.3d at 507. At common law, "the well-settled meaning of 'fraud' required a misrepresentation or concealment of *material* fact." *Neder*, 527 U.S. at 22, 119 S.Ct. 1827; *see United States v. Coffman*, 94 F.3d 330, 335 (7th Cir.1996). Here, the superseding indictment repeatedly charges that Stewart made false and fraudulent representations and promises. Because the word "fraudulent" clearly encompasses the notion of materiality, the superseding indictment cannot be considered deficient.[13]

In addition, we conclude that by any reasonable construction, the superseding indictment identifies misrepresentations that can only be characterized as material even though the word "material" is not used. *See United States v. Richards*, 204 F.3d 177, 192 (5th Cir.), *cert. denied*, 531 U.S. 826, 121 S.Ct. 73, 148 L.Ed.2d 36 (2000). In *Neder*, the Court explained that "a matter is material if ... 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Neder*, 527 U.S. at 22 n. 5, 119 S.Ct. 1827 (quoting Restatement (Second) of Torts § 538 (1976)).

The superseding indictment is replete with Stewart's misrepresentations concerning the financial well-being of Summit and EBL, sham reinsurance agreements, and the movement of funds between entities he controlled. For example, the superseding indictment charges that Stewart: provided false financial statements and reports to regulators, policyholders, customers, insurance agents, and others in order to conceal the financial weakness of Summit; falsely represented that Summit

---

**13.** We note that Stewart does not argue that the jury charge on mail and wire fraud was incorrect. The jury was specifically instructed that it must find a false statement or misrepresentation of material fact in order to convict Stewart of mail and wire fraud.

was in excellent financial condition when in fact it was statutorily insolvent; reclassified assets of entities he owned and backdated journal entries; and included a sizeable but worthless promissory note as an asset on Summit's books.

There can be no doubt that a reasonable person would attach importance to the above misrepresentations. An insurance agent contemplating selling policies for Summit, a customer considering purchasing a policy from Summit, a current policyholder making payments to Summit, or a regulator charged with overseeing Summit's compliance with the law all would find the false statements and representations Stewart made important, relevant, and material. Clearly, an "inference of materiality" arises, especially when we "construe the indictment liberally." *Cefaratti*, 221 F.3d at 507. We therefore reject Stewart's contention that the superseding indictment was insufficient.

In sum, the superseding indictment in this case performed its constitutional function. It fully apprised Stewart of the charges against him and did not hinder him from presenting a vigorous defense prior to and during trial. Thus, Stewart's mail and wire fraud convictions will not be vacated because the word "material" does not appear in the counts of mail and wire fraud contained in the superseding indictment.

### IV.

■ Stewart argues that he is entitled to various forms of relief due to the Supreme Court's recent decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi,* the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362–63. Stewart contends that the *Apprendi* rule mandates that his conviction be set aside, or alternatively, that his sentence be reduced. He also maintains that his forfeiture and restitution sentences are invalid under *Apprendi.* We have already held that *Apprendi* does not apply retroactively to cases on collateral review and therefore will not address here the merits of these arguments. *See United States v. Gibbs,* 125 F.Supp.2d 700 (E.D.Pa.2000).

### V.

Stewart also raises several other ineffective assistance of counsel claims that we find completely meritless. Finally, Stewart argues numerous other grounds that he believes mandate vacatur of his convictions and/or sentence. They are unpersuasive and require no discussion.

### VI.

In conclusion, the motion of Allen Stewart under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence will be denied.

### *ORDER*

AND NOW, this 7th day of June, 2001, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED it is hereby ORDERED that:

(1) the motion of Allen W. Stewart under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence is DENIED; and

(2) a certificate of appealability is not issued.